[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The above matters involve an arbitration award arising out of an automobile accident involving one of the parties, Bodner, and an uninsured motorist. On January 25, 1985 Bodner was stopped in traffic at a red light when he was struck in the rear by another automobile. The operator of that uninsured motor vehicle fled the scene and when apprehended by the police shortly thereafter was found to be intoxicated. Bodner suffered bodily injuries in the accident and made claim under his uninsured motor vehicle coverage. On failure to reach agreement with his insurer on the amount of damages, Bodner demanded arbitration, claiming compensatory and punitive damages.
On February 19, 1991 the three-member arbitration panel made an award, one member partially dissenting, and both parties are before this court seeking selected relief.
In the first listed matter, Bodner requests the court to confirm the award. He also requests the court to correct and modify the award by adding thereto the sum of $322,303.16 in punitive damages. He, further, asks for interest on the award pursuant to Sec. 37-3a, General Statutes.
In the second listed matter, United seeks to have the award vacated or modified because the arbitrators committed error in deciding the issues of an award for (1) future medical treatment and (2) past lost wages and future lost wages. United has withdrawn its third claim of lack of cooperation by Bodner.
 I
Bodner seeks interest on the award of the arbitrators under Sec. 37-3a from the date it was issued to the date when that award might be confirmed by this court. Section 37-3a provides, in part, that "interest . . . may be recovered and allowed in civil actions or arbitration proceedings under Chapter 909 . . . as damages for the detention of money after it has become payable. . . ."
In Middlesex Mutual Assurance Co. v. Walsh, 218 Conn. 681,701, the court noted that, by virtue of Sec. 37-3a, the legislature intended that prejudgment interest might be recovered in proceedings brought under provisions of Chapter 909, General Statutes. The court went on to say that when the question of CT Page 3794 payment of interest arose in this setting the trial court must make a "discretionary determination as to when the amount recoverable . . . under the policy was `payable' or whether it was `wrongfully detained' by Middlesex." Middlesex, supra, pp. 701, 702.
In a case handed down the same day as Middlesex, the court, in commenting on that case said, "We have today decided that a trial court has discretion, under General Statutes Section 37-3a, to award prejudgment interest on an arbitration award retroactively to some date prior to the date of the trial court's judgment affirming the award. Implicit in that determination is the conclusion that the prior date may be the date of the arbitration award." Chmielewski v. Aetna Casualty Surety Co.,218 Conn. 646, 675, 676.
The court finds that payment of money due and payable to Bodner by United was wrongfully delayed by United. See, e.g., file #312695 re action by Hodgson, J. Statutory interest on the award may commence from February 19, 1991.
In American Universal Insurance Co. v. DelGreco, 205 Conn. 178, our Supreme Court held that "where judicial review of compulsory arbitration proceedings required by 38-175c (a)(1) is undertaken under General Statutes, Section 52-418, the reviewing court must conduct a de novo review of the interpretation and application of the law by the arbitrators." This court will do so.
At the hearing before the arbitrators, Bodner made a claim for punitive damages. Tr. 2/1/91, p. 26. However, the arbitrators, after a brief recital of the facts of the accident, specifically stated that "all of said facts would normally support an award of punitive or exemplary damages were this a liability case. We, nevertheless believe, as a matter of law, that punitive or exemplary damages are not recoverable pursuant to Section 38-175c of the Connecticut General Statutes and the subject insurance policy in issue in this case." Award, p. 2.
To begin with, it must be remembered that the question before this court is whether punitive damages may be awarded in an uninsured motorist action under our statutes and applicable policy provisions; treatment of such an issue under liability provisions of a policy or statutes is not involved.
Under the uninsured motorist provisions of United's policy, Exhibit A, United assumed the obligation of: "We will pay damages which a covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury: CT Page 3795
1. Sustained by a covered person; and
2. Caused by an accident. (Emphasis added)."
The case of Tedesco v. Maryland Casualty Co., 127 Conn. 533, cited by both parties is helpful to this court only because it points out some good reasons why punitive damages should not be allowed in an uninsured motorist setting even though that court was speaking in 1941. Moreover the insurer's defined obligations in that case commenced with the words "all sums." Tedesco, supra, p. 535. Such was also the case in Avis Rent a Car Systems, Inc. v. Liberty Mutual Ins. Co., 203 Conn. 667, 670,671, to which both parties referred. Such a definition does not equate with the defined obligation of United, as previously quoted, to pay damages which one may be legally entitled to recover for bodily injuries sustained in an accident. The wordage in United's policy, setting forth its insuring agreement concerning uninsured motorist coverage is pretty much the same as that used in Section 38-175c (now, 38-336). Both Tedesco and Avis involved liability policies.
Widiss, Uninsured Motorist Coverage, Sec. 2.53, p. 100, in comparing the purposes of uninsured motorist coverage and punitive damages, says, ". . . the endorsement is primarily designed to provide compensation while punitive damages are primarily directed either at penalizing the tortfeasor or deterring the tortfeasor and others from committing like offenses in the future. Therefore, it seems undesirable to include punitive damages within the coverage, as the cost of such damages are not borne by the tortfeasor, but are ultimately distributed to other purchasers of the endorsement. Thus, deterrence is unlikely and indemnification is not involved." The case of Waterbury Petro Products, Inc. v. Canaan Oil Fuel Co.,193 Conn. 208, contains a discussion of the purpose of punitive damages as seen by that court. pp. 236, 237.
In the view of this court the arbitrators correctly applied the law of this state when they ruled that punitive damages are not recoverable pursuant to Section 38-175c of the Connecticut General Statutes and the subject insurance policy in issue in this case.
Other jurisdictions support their position. See, Aetna Casualty Surety v. Craig, 771 P.2d 212 (Okla.-1989); State Farm Mutual Auto Ins. Co. v. Daughdrill, 474 So.2d 1048 (Miss. 1985); Braley v. Berkshire Mutual Ins. Co., 440 A.2d 359 (Maine — 1982); State Farm Mutual Auto Ins. Co. v. Mendenhall, 517 N.E.2d 341
(Ill.App. 1987); California State Automobile Assn. Inter-Insurance Bureau v. Carter, 164 Cal.App.3d 257, 210 Cal. Rep. CT Page 3796 140 (Cal. 1985); Burns v. Milwaukee Mutual Ins. Co.,360 N.W.2d 61 (Wis.App. 1984).
The rule of DelGreco, supra, has been previously referred to as requiring a de novo review of the interpretation and application of the law by the arbitrators. Recently the Supreme Court approved a procedure "where factual findings made in compulsory arbitration proceedings are made subject to judicial review on the basis of a substantial evidence standard or a standard closely akin thereto." Chmielewski v. Aetna Casualty 
Surety Co., 218 Conn. 646, 665. However, in the view that this court takes of the instant matter, only the guidance of DelGreco will be required.
In the instant matter there is a transcript of the proceedings before the arbitrators. United has raised two questions of law based on the evidence. The first claim is that the arbitration panel committed error in applying the wrong law to the factual evidence before them on the claim of Bodner for damages for future medical treatment. The arbitrators specifically awarded Bodner $20,000 for future medical treatment. Award, p. 3.
In June of 1990, the Supreme Court handed down its decision in the case of Petriello v. Kalman, 215 Conn. 377. In Kalman, the Supreme Court set forth a new rule concerning compensation, in a tort action, for a future medical claim. The court stated, pp. 397-398: "We hold, therefore, that in a tort action, a plaintiff who has established a breach of duty that was a substantial factor in causing a present injury which has resulted in an increased risk of future harm is entitled to compensation to the extent that the future harm is likely to occur."
As a basis for rule, the Supreme Court said: ". . . it was fairer to instruct the jury to compensate the plaintiff for the increased risk of a bowel obstruction based upon the likelihood of its occurrence rather than to ignore that risk entirely (p. 396). . . . The probability percentage for the occurrence of a particular harm, the risk of which has been created by the tortfeasor, can be applied to the damages that would be justified if that harm should be realized (p. 397)."
All the medical evidence produced by Bodner in support of his claim was by way of documents. There was no in-person testimony. United claims that the evidence introduced by Bodner, will not, in view of the rule of Kalman, support, as a matter of law, the award of the arbitrators for future medical treatment in the amount of $20,000.
Bodner's medical support evidence was submitted to the CT Page 3797 arbitrators as part of a packet, marked Exhibit A, and Exhibits B, C, O and P. The basic claim of Bodner is that his doctors support his claim for future surgery to be performed on his cervical spine as a result of the accident. The arbitrators awarded him $20,000 for future medical treatment.
Dr. James Merikangas, a neurologist, examined Bodner on April 17, 1990. He had a Radiogram performed and came to the conclusion that Bodner had a ruptured disc at C6-7. He therefore referred Bodner to Dr. Enzo Sella for consideration of cervical spine surgery. He also ordered a Motor Nerve Conduction Study which was done and reported as "within normal limits."
Dr. Sella examined Bodner on May 29, 1990 and reported that "His symptoms do not appear severe enough at this point to warrant surgery but surgery is a possibility in the future, especially if he develops more radiculopathy."
Dr. Merikangs, after receiving Dr. Sella's report, saw Bodner again on August 15, 1990 and reported that "He has reached maximum medical improvement. . . . He may require surgery in the future. . . ."
On October 23, 1990 Dr. Sella replied to an inquiry from Attorney Vaccaro concerning Bodner's future. Dr. Sella wrote that Bodner had a cervical disc herniation at C6-7. The procedure that Bodner might require is called anterior cervical discectomy and fusion with iliac bone graft. The operation costs about $9,000 plus 5 days hospitalization. Dr. Sella did not know what hospital or anesthesia charges would be. Bodner would not be able to work as a dentist for at least 3 months post op. The chances of surgery at this point are less than 50/50. Most likely Dr. Bodner will be able to live with his symptoms and there is more than a 50/50 chance that the symptoms will gradually subside in time as nature will most likely proceed and do a spontaneous fusion.
Dr. W. Jay Krampinger, who is attached to the University of Connecticut Health Center[1] reported on April 15, 1988 that "Because of a good response to conservative treatment, do not anticipate surgery; he may need physical therapy." Dr. Krampinger had previously examined Bodner on March 20, 1987 and at that time found that "at the present time do not believe he is a candidate for any surgical intervention."
On June 20, 1990 Bodner was examined by Michael P. Connair, an orthopaedic specialist. Dr. Connair reported, Exhibits B and C, that "Based on his present level of symptoms, I do not feel that surgical intervention is going to be required for his cervical symptoms." He made his report after an interview and CT Page 3798 exam of Bodner and a review of reports and studies made by Dr. Merikangas and medical records from New Britain General Hospital and the University of Connecticut Medical Center.
The recital of the findings of the above mentioned doctors is made to indicate the search that this court made of the record to find a medical person who suggested a "probability percentage for the occurrence" of cervical surgery being performed on Bodner in the future. Kalman, supra, p. 397. The court could find none.
Accordingly, this court finds that the arbitrators failed to apply the law of this state when they made an award to Bodner for future medical treatment in the sum of $20,000 and, thus, have so imperfectly executed their powers in this regard that this specific award must be vacated.
The second claim that United makes is that the panel erred as a matter of law in applying the wrong law to the factual evidence before them on the claim of Bodner for damages for past lost wages and future lost wages/earnings. The arbitrators specifically awarded Bodner $155,475.99 for "past lost wages" and $240,714 for "future lost wages/earnings." Award, p. 3.
In support of his claim for lost earnings and loss of earning capacity, Bodner made available to United, and placed in evidence, his (1) appointment books; (2) fee log books, which contained the patient's name, the charge for the treatment and the amount collected. These items were produced for each year from 1983 to 1989.
Bodner also made available to United and placed in evidence his income tax returns for the years 1983 to 1989. While he filed joint returns with his wife, she is listed as a housewife.
Bodner testified at considerable length on financial matters.
United relies heavily on the case of Floyd v. Fruit Industries, Inc., 144 Conn. 659 (1957). Floyd was a death action and held that the offsetting factor of probable income taxes on probable net earnings should be called to the attention of the jury in the same way as other offsetting factors. It does not appear to have been followed as, nor to be seen as, the rule of law in this state on the subject of proving earning capacity and loss of wages in personal injury actions.
Turner v. Scanlon, 146 Conn. 149 was decided about 2 years after Floyd. The plaintiff, in Turner, had operated a small upholstery and interior decorating business for almost 20 years CT Page 3799 prior to his automobile accident with Scanlon. At his trial he introduced his income tax returns showing gross and net earnings of his business both before and after his accident. In answer to a claim of no basis for a lost earning capacity charge the court said (at p. 159): "The law requires in such a case that evidence of loss of earning capacity shall have that degree of certainty which the nature of the case allows (citation). The evidence met that test, and the trial court properly submitted these issues to the jury." See also, Mihalak v. Cickowski, 4 Conn. App. 484,487.
United cites Tessler v. Johnson, 23 Conn. App. 536 (1990) as also supporting his claim. It does not. The ruling in that case was specifically restricted to death actions. Tessler, supra, p. 542. And Tessler relied on Floyd to support its position.
The panel correctly applied the law of this state in determining the basis for the awards for past lost wages and future lost wages/earnings in the instant matter.
The request of Dr. Joseph A. Bodner to correct and modify the award by adding punitive or exemplary damages to the award is denied.
The request of Dr. Joseph A. Bodner for interest on the award is granted to run at the statutory rate from February 19, 1991.
The request of United Services Automobile Association to correct or modify the award by deleting the portion of the award for past lost wages and future lost wages/earnings is denied.
The request of United Services Automobile Association that the award be vacated is denied.
The award is corrected and modified by vacating therefrom that portion of the award stated to be made for "future medical treatment — $20,000" so that as corrected and modified the net award reads $624,606.32.
The net award as corrected and modified in the amount of $624,606.32, plus interest as previously indicated, is confirmed.
Judgment may enter accordingly.
HAROLD M. MULVEY STATE TRIAL REFEREE